## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA        :
                                :        CRIMINAL ACTION
v.                              :        NO. 1:13-cr-00186-SCJ-RGV
                                :
DEVANTE DAVIS                    :

## MAGISTRATE JUDGE'S FINAL REPORT,
## RECOMMENDATION, AND ORDER

Defendant DeVante Davis ("Davis") is charged in a superseding indictment, along with co-defendants DeJuan Simmons ("Simmons"), Carlin Tibbs ("Tibbs"), and DeVante Barkley ("Barkley"), with one count of Hobbs Act conspiracy to commit robberies, two counts of Hobbs Act robbery of two McDonald's restaurants, both of which occurred on December 27, 2012, and two counts of knowingly using a firearm in furtherance of these robberies, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(ii)-(iii), and 1951(a). See [Doc. 40].[1] Davis has filed a motion to dismiss the superseding indictment, alleging a violation of his Sixth Amendment right to a speedy trial, [Doc. 163], which the government opposes, [Doc. 171]. The Court held

---

[1] The superseding indictment also charges Simmons and Tibbs with two additional McDonald's robberies in January 2013, and it also contains a forfeiture provision pursuant to 18 U.S.C. §§ 924(d)(1), 981(a)(1)(C), and 982(b), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c). See [Doc. 40]. The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

an evidentiary hearing on July 13, 2016,[2] and the parties filed post-hearing briefs, see [Docs. 196, 200, & 202].  For the reasons that follow, it is **RECOMMENDED** that Davis' motion to dismiss the superseding indictment, [Doc. 163], be **DENIED**.

## I.  STATEMENT OF FACTS

### A.   The Pre-Superseding Indictment Investigation of Davis

On May 8, 2013, a grand jury in the Northern District of Georgia returned an indictment against Simmons and Tibbs, charging them with one count of Hobbs Act conspiracy to commit robberies, three counts of Hobbs Act robbery of three McDonald's restaurants that occurred in December 2012 and January 2013, and three counts of knowingly using a firearm in furtherance of these robberies, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(ii)-(iii), and 1951(a).  See [Doc. 1]; (Tr. at 8-9; Gov. Ex. 1).[3]  Around mid to late May of 2013, Federal Bureau of Investigation ("FBI") Special

---

[2] See [Doc. 191] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  The parties also submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for Davis' exhibit.

[3] Following media coverage of the surveillance footage from one of the robberies, Simmons and Tibbs were identified as the individuals in the photographs and they turned themselves in to law enforcement in January of 2013.  (Tr. at 9-10).  Additionally, "one of the descriptions of the robbers was that [he] had dreadlocks," (Tr. at 11), and subsequently, Davis was identified as a person of interest after a resource officer from Davis' high school "provided a tip to the local police stating that he had seen the video or the surveillance footage on the news and that one of the individuals was [] Tibbs and that [] Tibbs also had a friend, [] Davis, who had dreadlocks," (Tr. at 10-11, 55).  Moreover, when Tibbs turned himself in to law

Agent Allen Brett Fears ("Agent Fears"), who was a member of the violent crimes squad in the Atlanta field office at that time, was assigned to the investigation of these "series of armed McDonald's robberies in the metro Atlanta area." (Tr. at 5-8, 10). Upon entering the investigation, Agent Fears was aware that more than two individuals were involved in these robberies based on witness statements and interviews and surveillance footage depicting more than two individuals committing the offenses, and he was tasked with the responsibility of identifying the other suspects involved in the robberies. (Tr. at 9-10).

On August 26, 2013, Tibbs proffered information to the U.S. Attorney's office that "basically implicated [] Davis in the series of McDonald's robberies occurring in the metro Atlanta area."[4] (Tr. at 15). He relayed to Agent Fears that he attended

_____

enforcement, he had a cell phone in his possession which contained a telephone number assigned to the contact named "Vante" with "DirtyDreadz" in parentheses, both of which were later identified as nicknames for Davis. (Tr. at 11-12; Gov. Ex. 2 (all caps omitted)). Therefore, officers with the Dunwoody Police Department requested subscriber information for that particular telephone number, which was received on January 30, 2013, and listed the subscriber as "Darryl D. Burkes" ("Burkes"), later identified as Davis' cousin, but noted that the phone number was suspended as of January 27, 2013. (Tr. at 12-14; Gov. Ex. 3). In April 2013, the Dunwoody Police Department released "Wanted" flyers depicting an image of Davis and noting that he was a "Person of Interest" in an armed robbery of a McDonald's restaurant located in Dunwoody. (Tr. at 14, 33; Gov. Ex. 4). The flyer also noted that an award of up to $2,000 was offered via Crime Stoppers of Atlanta for any information on the whereabouts of Davis. (Tr. at 14; Gov. Ex. 4).

[4] When Tibbs initially spoke with the Dunwoody police officers, he only "mentioned [] Davis' name to them just as a friend, but he didn't mention or

high school with Davis at North Springs High School, that he had worked with Davis previously at the Funhouse in Sandy Springs, that Davis was currently employed at Lenox Taxi Company in Atlanta, and that at the time of the alleged robberies, Davis was living at an apartment complex with his friend, Breshun Betts, and his friend's mother, Bridgett Betts.  (Tr. at 15-16).[5]

On September 24, 2013, Simmons proffered information to the FBI that "also implicated [] Davis in the series of McDonald's robberies."  (Tr. at 17).  Simmons confirmed that, at the time of the robberies, Davis was living with the Betts family, but he reported that Davis had since been residing in the Washington Road area of metro Atlanta, though he had not spoken to Davis since his incarceration.  (Tr. at 17-18).[6]

On October 8, 2013, Agent Fears interviewed Bridgett Betts, and she confirmed that Davis had resided with her and her son in their apartment from

---

implicate him in any of the robberies at that time."  (Tr. at 16).

[5] In September 2013, Agent Fears interviewed the manager of Funhouse and learned that Davis, Barkley, Tibbs, and Simmons' brother, had all worked at the Funhouse, but that Davis was terminated from that job in May of 2012.  (Tr. at 16-17).

[6] A follow-up proffer session with Simmons occurred on October 1, 2013, and during this meeting, Simmons implicated his younger brother, D.S., who was only 17 years old at the time of the alleged criminal acts, in the robberies.  (Tr. at 17-18, 51).

4

March 2012 to January 2013 and that Davis worked for a taxi company. (Tr. at 18-19). Agent Fears also interviewed Breshun Betts on the following day, and he likewise confirmed that Davis resided with him and his mother from March 2012 through January or February of 2013. (Tr. at 19). He explained that he attended high school with Davis; that Davis' mother, Sheila Davis, resided on Waterboy Road; that the last time he spoke to Davis was about two months prior to the interview; and that Davis was in the Fairburn area, but he did not have a contact number for him. (Tr. at 19, 147-48). On October 15, 2013, Agent Fears also interviewed D.S., and he "provided information regarding the roles of the individuals in the robberies," including the role that Davis played during the robberies. (Tr. at 20).[7]

In December of 2013, Agent Fears interviewed a manager at the Atlanta Lenox Taxi Company, and he obtained an employment application that Davis completed on November 14, 2012, and Davis' timecards. (Tr. at 21-22, 33-34; Gov. Ex. 5). On the employment application, Davis listed his address as 553 Waterboy Road, Fairburn, Georgia, 30213, and the manager indicated that Davis was still working

---

[7] Agent Fears testified that, at this point in the investigation, they were "getting some conflicting information between [] Tibbs and [] Simmons" and that they were "really trying to determine the roles that the individuals played in the McDonald's robberies" so that they could obtain a superseding indictment. (Tr. at 20).

5

there at that time and that he had cut off his dreadlocks and had "more of a short cropped Afro-type hairstyle."[8]  (Tr. at 22, 34, 55-56, 62; Gov. Exs. 5 & 7).

In late December 2013, Agent Fears went to the Waterboy Road address and spoke to Davis' grandparents, as well as Davis' cousin, Candace Alexander ("Alexander"), who was visiting from the Chicago area.  (Tr. at 23-24, 26, 36-37). Agent Fears advised them that he wanted to interview Davis, and he provided them with his business card, and Davis' grandparents indicated that Davis did not reside with them at the Waterboy Road address and that they had not seen him "in a little while."  (Tr. at 23, 39).  Alexander reported that she had not seen Davis and that she last saw him in Chicago, but she provided Agent Fears with a telephone number for Davis' girlfriend, Danisha Simpkins ("Simpkins"), as well as a telephone number for Davis' mother, but none of the family members provided a direct contact number for Davis.  (Tr. at 23-24, 52).[9]

───────────────

[8] Agent Fears testified that he was aware that Davis normally worked weekends at Lenox Taxi Company, but when he went back to the business at a later date, prior to the return of the superseding indictment, Davis had quit and was no longer working there.  (Tr. at 34-35).  Davis had listed on the employment application that he was enrolled at Georgia Perimeter College, but Agent Fears did not contact the school or otherwise pursue this lead.  (Tr. at 35-36).  Agent Fears also did not search any social media platforms for Davis' profile or information.  (Tr. at 37).

[9] Agent Fears contacted Alexander on one or two more occasions, but she was not interested in speaking with him or in assisting him with locating Davis.  (Tr. at 24).  He also surveilled the Waterboy Road residence on several occasions, but never

On December 23, 2013, Davis contacted Agent Fears, who advised Davis that he wanted to interview him and that Davis had "a local arrest warrant from Fulton County regarding the McDonald's robbery." (Tr. at 24-25, 40, 43-44, 47; Def. Ex. 1).[10] Davis told Agent Fears that he would turn himself in "after the holidays because it was so close to Christmastime"; however, Davis never turned himself in to the "Fairburn Police Department or the Fulton County authorities." (Tr. at 25-26).[11] On January 7, 2014, the grand jury returned the superseding indictment against Davis and his three co-defendants. (Tr. at 26-27, 59; Gov. Ex. 6); see also [Doc. 40].

**B.   The Post-Superseding Indictment Investigation of Davis**

After the superseding indictment was returned in January 2014, Agent Fears obtained federal arrest warrants for Davis and Barkley, and he arrested Barkley at his mother's apartment on January 14, 2014. (Tr. at 27, 59).[12] Following Barkley's

---

saw Davis at that location. (Tr. at 24, 38-39).

[10] In Agent Fears' report, which he completed on April 20, 2016, it was noted that he advised Davis about a warrant in Dunwoody for his arrest, but Agent Fears testified that it was "a misprint" and that "[i]t should [have been] Fulton County, not Dunwoody." (Tr. at 41-44); see also (Def. Ex. 1).

[11] Agent Fears testified that he believed Davis contacted him from his mother's telephone number and that he subsequently tried to contact that number, but it was no longer in service. (Tr. at 26, 40, 46, 49). He also testified that he did not "get any information" from Davis during the initial call, including an address or any contact information. (Tr. at 47-48).

[12] Agent Fears testified that he had received information about Barkley's whereabouts and he talked to the manager of the apartment complex and a

arrest, he told investigators that he had attended high school with Davis, and he implicated Davis in the series of McDonald's robberies. (Tr. at 28). He also advised Agent Fears that Simpkins, Davis' girlfriend, had received money from one of the robberies. (Tr. at 29).

Agent Fears interviewed Simpkins on March 13, 2014, and she said that she and Davis "were no longer dating or seeing each other" and that the last time she had seen him was in January 2014. (Id.). She also stated that Davis' "living arrangements were pretty unstable," that he was "from place to place," and that she did not have a contact number for him. (Tr. at 29-30). Agent Fears then surveilled two to three different apartment complexes "around the Washington Road/Camp Creek area," the Waterboy Road address of Davis' grandparents, and "Simpkins' residence with her parents," with no success. (Tr. at 30-31). Agent Fears spoke with the apartment manager and maintenance workers at each of the apartment complexes on his initial surveillance, but none of them could confirm that Davis lived at any of those apartments, though they did confirm that they had seen him in the area. (Tr. at 31).

In December 2014, Agent Fears was assigned to another field office, and FBI Special Agent Benni Jonsson ("Agent Jonsson"), who was a member of the violent

---

maintenance worker and they both confirmed that Barkley possibly lived in a certain apartment, which ultimately led to his arrest. (Tr. at 28, 61-62).

crime squad at that time, was assigned to continue the investigation into Davis' whereabouts.  (Tr. at 32, 65-67).  Agent Jonsson initially ran Davis' criminal history and performed a public records search using a database program entitled "CLEAR" to search a multitude of public records from various companies in order to find potential current addresses for Davis, and "[t]here was a hit that [] [came] back to [] Davis," showing that he was arrested and incarcerated in Fulton County.  (Tr. at 67-69).  However, it was later determined that the person incarcerated in Fulton County was actually Davis' brother, Kiante Davis, who had previously used Davis' name and date of birth.[13]  (Tr. at 68, 75).[14]  In addition, the most recent address listed

_____

[13] In fact, "DeVante Davis" was actually listed as an alias for his brother Kiante Davis on Fulton County's inmate search website.  (Tr. at 68).

[14] On December 24, 2014, Agent Jonsson met with Kiante Davis at the Fulton County jail and explained to him that he was looking for Davis in connection with a robbery, but Kiante Davis said he was not in contact with Davis, that he did not have any contact information for him or know his location, and that the last he had heard, Davis was in the Chicago area "somewhere."  (Tr. at 70-71, 74, 104).  Agent Jonsson told Kiante Davis that if he heard from Davis, to "let him know to call . . . the FBI."  (Tr. at 71).  Agent Jonsson later obtained jail recordings from about November 2014 to April 2015 and learned that on December 25, 2014, Kiante Davis spoke to an unknown female and told her that the FBI was there the day prior looking for his little brother, that Kiante Davis was in frequent contact with his mother and the phone number he used to contact her, that he had a lot of three-way phone calls with a female who would then call another individual, and that he was using another inmate's pin number so "it would appear that the other inmate was actually making the phone call[.]"  (Tr. at 71-73, 107-08).  Agent Jonsson testified that he did not call the number believed to belong to Davis' mother because "if [Davis] was staying with the mother, [he] was hoping to find a good address for the mother later on and then be able to find [Davis] at that place" and that he "was afraid if [he]

for Davis and his mother was the Waterboy Road address of his grandparents. (Tr.

at 69, 72, 77).[15]   Agent Jonsson also obtained records from the Department of Labor,

which showed the most recent information was for the second quarter of 2014,

during which Davis earned about $200.00 for the entire quarter. (Tr. at 69-70).  In

about January 2015, Agent Jonsson contacted "an old colleague . . . who worked in

the Chicago area" and "asked him to run databases both for arrests and also for stop

cards," but nothing came back for Davis. (Tr. at 74-75).  In the same month, Agent

_____

[] call[ed] the mother then the mother would know [he] was looking at her and then
[Davis] could be spooked from that." (Tr. at 73-74).  Agent Jonsson had also learned
that Davis' mother had a "local warrant" for her arrest so he did not know "if that
would influence her willingness to talk[.]" (Tr. at 73).  Agent Jonsson also realized
that Kiante Davis' arrest under Davis' name may have caused the federal arrest
warrant issued for Davis to be pulled in October of 2014 since only the state warrant
was showing in the National Crime Information Center ("NCIC") database, and he
therefore had the federal warrant reinstated in December of 2014, but realized in
about February of 2015 that the FBI number associated with the federal warrant for
Davis was still Kiante Davis' FBI number. (Tr. at 75-76, 104-06).  Agent Jonsson
therefore had to remove the FBI number associated with Davis' warrant to correct
the mistake. (Tr. at 76, 105).

[15]  Agent Jonsson testified that he surveilled the Waterboy Road residence
beginning in December 2014 or January 2015 on about five occasions and that he also
contacted Davis' grandfather and met with him at that location around the same
time. (Tr. at 77-78, 80).  Agent Jonsson said that Davis' grandfather reported that
another agent had been there twice looking for Davis, but that he did not know the
whereabouts of Davis or his mother. (Tr. at 77-78).  Agent Jonsson described that
Davis' grandfather "wasn't very cooperative" and that he said that he "didn't have
anything to do with either of them." (Tr. at 78).  Agent Jonsson also spoke with
some of the neighbors and one of them said they had observed Davis at the house
around December of 2014, (Tr. at 79), but during his surveillance of the property,
Agent Jonsson never observed Davis at that location, (Tr. at 84).

Jonsson also sought a court order for cell site records for the number he believed was associated with Davis' mother in order to "get a general idea of where she was located," but he had to make a correction because the number was incorrect by one digit, and he therefore obtained another court order in February 2015. (Tr. at 81, 108-09).[16]

In February of 2015, Agent Jonsson learned that Davis' cousin, Burkes, was incarcerated at the Fulton County jail, and he interviewed him. (Tr. at 83). Agent Jonsson advised Burkes that he was looking for Davis, but Burkes said that if Agent Jonsson could get him released from jail, "he would help [him] find [Davis.]" (Id.).[17] Agent Jonsson also contacted Burkes' girlfriend, Dalshanica Preston ("Preston"), who said that she did not know where Davis was, and he surveilled the two residences he believed were associated with Burkes and Preston, but he never saw Davis at either of those places. (Tr. at 84-86). Moreover, he contacted Simpkins in

---

[16] Agent Jonsson also requested the telephone toll records for the female through whom Kiante Davis made his three-way calls while incarcerated. (Tr. at 93).

[17] Around this time, Agent Jonsson had either reviewed the jail recordings from Kiante Davis or Burkes and heard one of them "make a reference saying something like Vante was downstairs," so he sent a photograph of Davis to a Fulton County task force officer in case any officer recognized Davis as a Fulton County inmate since Davis did not have any fingerprints on record, but this also proved to be unsuccessful. (Tr. at 97). Agent Jonsson also pulled the financial records of Kiante Davis, Burkes, and an individual named Antoine Wisdom at the Fulton County jail to see who was depositing money in their accounts, but again there were no successful results from this effort. (Tr. at 98).

February and March 2015, but she reiterated that she had no contact information for Davis, though she believed he was "staying in Chicago with an aunt by the name of Angie." (Tr. at 87).[18] During this time, Agent Jonsson surveilled Simpkins' parents' Roswell residence, but he never observed Davis at that location. (Id.).

In April and May of 2015, Agent Jonsson received the cell site data for the phone believed to be associated with Davis' mother and the telephone toll records for the female through whom Kiante Davis was making his three-way calls from jail. (Tr. at 81, 92-93). Another agent analyzed these records and discovered "a list of common numbers that both were calling," but efforts to find Davis from these records proved to be unsuccessful. (Tr. at 93-94).

In August 2015, Agent Jonsson, who was "running out of leads" at that time, decided to run Davis' public records again and an "old address [of 471 Clara in

---

[18] Agent Jonsson testified that he reviewed the CLEAR reports again, but only "very old" addresses were related to Chicago so he requested assistance from a FBI analyst in March 2015 and contacted his colleague in Chicago again, but he was never "able to develop any lead for [] Davis in Chicago[.]" (Tr. at 88-90; Gov. Ex. 8). At this time, Agent Jonsson also researched Sheila Davis' work history and learned that she was working as a caregiver. (Tr. at 91, 111-12); see also (Tr. at 148-49). He spoke to her employer, but the employer only had the same contact number and address Agent Jonsson already had in his possession and it appeared that Sheila Davis had not been working for this employer for awhile. (Tr. at 91, 112). Agent Jonsson also learned that Sheila Davis was working at a McDonald's restaurant and he therefore spoke with McDonald's head of security, who explained that because most restaurants were franchised, he did not have access to all of the records. (Tr. at 92-93).

Riverdale] popped up as a new address, like he was using the address again." (Tr. at 94).  Agent Jonsson then conducted surveillance at this address on about five occasions and spoke with a neighbor, but he never observed Davis at that address. (Tr. at 95).

In mid-October 2015, Agent Jonsson was reassigned to a different squad, and on November 2, 2015, FBI Special Agent Matthew Winn ("Agent Winn") took over as case agent for the Davis investigation.  (Tr. at 67, 98, 116).  Agent Winn began his investigation by running a criminal history check and a CLEAR database check on Davis, similar to what the other agents had done, and he also reviewed the cell site phone records for Sheila Davis that Agent Jonsson had obtained, but these efforts were still unsuccessful in locating Davis.  (Tr. at 116-17).  Agent Winn then "requested [a] squad analyst to conduct database checks, social media checks, [and] Department of Labor checks," and with respect to social media, "[t]he analyst came up with a photo of [] Davis [from 2012] off of the Facebook account of [] Simpkins, his former girlfriend."  (Tr. at 117-18, 136-37).  Agent Winn also said that the most recent wage information for Davis he found was under $300.00 from his employment with AlphaStaff Systems, Inc., during the second quarter of 2014, and

that he did not contact this employer based on the time frame of the employment and the fact that it appeared to be short term.  (Tr. at 118-19, 141).[19]

Based upon the database checks, Agent Winn conducted surveillance at a couple of addresses, including the Waterboy Road address, in November and December of 2015, but he never observed Davis at those locations.  (Tr. at 119-20).  In January 2016, Agent Winn was "busy working an investigation into an active and violent home invasion crew that occupied all of [his] time for that month," but he resumed the Davis investigation in February 2016.  (Tr. at 120-21).  At that time, Agent Winn learned of some other possible addresses for Davis, and he interviewed the manager of an apartment complex on Janice Drive in Atlanta, who recognized Davis from a photo, but the manager said that, while Davis had lived there in the past, he had not "lived there in some time."  (Tr. at 121).  The manager also informed Agent Winn that she managed another property in College Park, Georgia, and that "she believed that she had seen [Davis] at that residence property more recently[.]" (Id.).  Agent Winn went to that property, but Davis "was not on file there" and had "never had a record of residing there[.]"  (Tr. at 121-22).  Agent Winn spoke with the

---

[19] Agent Winn also performed a financial check on Davis, but nothing resulted from those queries.  (Tr. at 137-38).  And, at the time Agent Winn took over the investigation, Davis was no longer enrolled at Georgia Perimeter College and he did not conduct any follow up with the school because "[f]rom what [he] understood, [Davis] had only attended less than a semester at that college several years before [he] obtained the case" and he "felt that [] was a low priority lead[.]"  (Tr. at 138-39).

maintenance and security personnel at that apartment complex and showed them a photo of Davis, as well as offered a reward for information, but those efforts did not result in any leads as to Davis' whereabouts. (Tr. at 122).

In March 2016, Agent Winn ran a "NCIC off-line search or query" in order to determine whether any other law enforcement agencies in the United States had run Davis' name through the NCIC database, and he discovered that the Michigan state police had queried Davis' name in November 2014. (Tr. at 122-23). Agent Winn contacted the Michigan authorities and they advised him that Davis' name had come up in an investigation and they sent him a police incident report dated November 9, 2014, in which Davis was referenced. (Tr. at 123; Gov. Ex. 10). Agent Winn explained that the report described an incident of alleged domestic assault between a husband and wife that began because the husband believed that his wife, "Natasha," was having an extramarital affair with Davis. (Tr. at 125-26, 129; Gov. Ex. 10). The husband, who was the alleged victim of the assault, informed the Michigan officers that he discovered on the Internet that Davis was wanted for questioning in connection with an armed robbery in Georgia and that the FBI had contacted his wife and her friend Alexander, who was Davis' cousin, in the recent past in an attempt to locate Davis. (Tr. at 127; Gov. Ex. 10). The Michigan authorities ran Davis' information through the NCIC database, but the federal

warrant did not come up, though a state warrant for armed robbery appeared. (Tr. at 127; Gov. Ex. 10).

Based on this information, Agent Winn began searching for "Natasha" in an effort to locate Davis. (Tr. at 129). At this same time, Agent Winn also focused on locating Davis' mother, and when he entered her identifying information in CLEAR, he obtained several addresses associated with her, including the Waterboy Road address and an address at 3350 Mt. Gilead Road in Atlanta that was associated with her as of July 21, 2015. (Tr. at 130-31, 145; Gov. Ex. 12); see also (Tr. at 148, 152-53). Agent Winn also used the CLEAR database to search for Kiante Davis, and this search produced an address at Mt. Gilead Road in Atlanta, which was in common with his mother's report, but his mother's residence was Unit 8, while Kiante Davis was listed as residing in Unit 20, and the report showed that he had been associated with this address as of November 5, 2015. (Tr. at 131, 146; Gov. Ex. 11).[20] Agent Winn surveilled the Mt. Gilead address on three occasions and spoke with a maintenance man at the apartment complex, who recognized Davis from a photo and said that he lived in Unit 8. (Tr. at 132).

---

[20] Sheila Davis testified at the evidentiary hearing, and she said that Davis and his sister, Cassandra White, lived in one apartment at the Mt. Gilead address while she lived in another apartment at that complex. (Tr. at 152).

16

On March 16, 2016, Agent Winn observed Davis walk around the apartment complex, enter a vehicle with his cousin, Burkes, and leave the apartment complex in the vehicle. (Tr. at 132-33). Agent Winn requested assistance from the Atlanta Police Department ("APD"), and the APD subsequently stopped the vehicle and arrested Davis on the outstanding federal arrest warrant. (Tr. at 132).[21] At no time during the FBI's investigation did the agency seek the assistance of the U.S. Marshals in locating and arresting Davis.[22] (Tr. at 135).

## II. DISCUSSION

Davis moves to dismiss the superseding indictment due to the 26-month delay between the January 2014 superseding indictment and his March 2016 arrest, which he asserts violates his right to a speedy trial pursuant to the Sixth Amendment of the United States Constitution. See [Docs. 163, 178, 196, & 202]. In response, the government contends that "the reason for [the] delay weighs in [its] favor," and that

---

[21] During the booking process, Davis provided law enforcement the Mt. Gilead address and two phone numbers, neither of which were associated with Davis. (Tr. at 134). Agent Winn testified that when an individual is arrested but does not have a contact number, such as Davis, the individual is encouraged "to at least give the phone number of a relative or somewhere where they . . . can be reached or somebody can be reached on their behalf." (Tr. at 134-35).

[22] Agent Winn testified that he spoke with the U.S. Marshals' service and they advised him that they had a case involving Kiante Davis that ended with his arrest on a state warrant in 2013. (Tr. at 143). In addition, Sheila Davis confirmed that she spoke with the U.S. Marshals, in Davis' presence, around the end of August 2012. (Tr. at 153-54, 156).

Davis cannot show he suffered actual prejudice as a consequence of the delay.  [Doc. 200 at 13-14].

"The federal constitution guarantees the right to a speedy trial." United States v. Treisback, Criminal Action No. 2:12–CR–00026–RWS, 2014 WL 2003031, at *4 (N.D. Ga. May 14, 2014), adopted at *1 (citations and internal marks omitted). "Sixth Amendment speedy trial rights attach at the time of arrest or indictment, whichever comes first, and continue until the date of trial." Id. (citations and internal marks omitted).  "A defendant's Sixth Amendment right to a speedy trial cannot be quantified into a specific number of days or months," but "must be evaluated under the particular circumstances of each case using a balancing test which weighs the conduct of both the government and the defendant." United States v. Spaulding, 322 F. App'x 942, 945 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted).

The Supreme Court has established four factors to be considered in deciding whether a defendant's constitutional right to a speedy trial has been violated: "(1) whether the delay before trial was uncommonly long; (2) whether the government or the defendant is more to blame for that delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice as a result of the delay."[23]  United States v. Duke, Criminal Action No.

---

[23] The first factor of the balancing test, the length of the delay, "serves as a double inquiry" in that first, it is a "threshold inquiry that the defendant must

4:11–CR–004–HLM–WEJ, 2011 WL 1811439, at *2 (N.D. Ga. Apr. 27, 2011), adopted by 2011 WL 1833213, at *5 (N.D. Ga. May 12, 2011) (footnote and citation omitted) (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)); see also United States v. Lamar, 562 F. App'x 802, 805 (11th Cir. 2014) (per curiam) (unpublished) (citations omitted); United States v. Bibb, 194 F. App'x 619, 622 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted). "When balancing the *Barker* factors, courts must articulate how heavily each factor weighs against the identified party." Duke, 2011 WL 1811439, at *3 (internal marks omitted) (quoting United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006)). And, "[i]n the Eleventh Circuit, a defendant generally must show actual prejudice unless the first three factors . . . all weigh heavily against the government." Id. (last alteration in original) (citations and internal marks omitted); see also Bibb, 194 F. App'x at 622 (citation omitted).

The government concedes that the delay in this case of approximately 26 months between the superseding indictment and Davis' arrest is presumptively prejudicial, see [Doc. 200 at 12]; see also Ingram, 446 F.3d at 1336 (citation and internal marks omitted) ("Delays exceeding one year are generally found to be

---

satisfy in order for [the court] to weigh the remaining three factors," and second, the court must "examine[] the extent to which the delay stretches beyond the bare minimum needed to satisfy the threshold showing of presumptive prejudice." United States v. Villarreal, 613 F.3d 1344, 1350 (11th Cir. 2010) (citations and internal marks omitted).

presumptively prejudicial."), and that Davis asserted his right to a speedy trial in a timely manner, [Doc. 200 at 12]. Therefore, the first and third factors weigh in Davis' favor. However, the government maintains that the second factor, the reason for the delay, weighs in its favor, but that even if the Court finds it weighs in Davis' favor, it does not weigh heavily against the government. See [Doc. 200 at 12-13]. Because the threshold inquiry has been satisfied by the approximately 26-month delay, the Court turns to the second Barker factor. See United States v. Knight, 562 F.3d 1314, 1323 (11th Cir. 2009) (citation omitted).

"The government bears the burden of explaining the reason for the delay." Spaulding, 322 F. App'x at 945 (citation omitted). "Different reasons for delay are accorded different weight in the *Barker* analysis," and therefore, "the reasons for delay must be carefully analyzed to see who created the delay and whether that delay was an unacceptable manipulation or an acceptable incident of the criminal process." United States v. Jones, No. 1:05-cr-617-WSD, 2007 WL 2071267, at *21 (N.D. Ga. July 19, 2007), adopted at *3 (citations omitted); see also United States v. Schlei, 122 F.3d 944, 987 (11th Cir. 1997). In analyzing the second factor, the Eleventh Circuit has noted that "[g]overnment actions that are tangential, frivolous, dilatory, or taken in bad faith weigh heavily in favor of a finding that a speedy trial

20

violation occurred."[24] Bibb, 194 F. App'x at 622 (alteration in original) (citation and internal marks omitted).  However, "delays that occur for valid reasons . . . will not be accorded heavy weight against the [g]overnment," and "negligence is a more neutral act that should not be weighed as heavily as bad faith."  Id. (citations and internal marks omitted).  That is, "[b]etween diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground," and "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun."  Doggett v. United States, 505 U.S. 647, 656-57 (1992).  "And such is the nature of the prejudice presumed that the weight [the court] assign[s] to official negligence compounds over time as the presumption of evidentiary prejudice grows," and the "toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial."  Id. at 657 (internal citation omitted).  However, "[t]o be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice."  Id.; see also United States v. Harris, 376 F.3d 1282, 1290 (11th Cir. 2004) (citation omitted)

---

[24] "For example, the government may not deliberately delay a trial in order to weaken a defendant's case."  Spaulding, 322 F. App'x at 946 (citation omitted).

("Nonetheless, the Supreme Court has recognized that a defendant generally cannot establish a Sixth Amendment speedy trial claim, however long the delay, if the government pursued the prosecution with 'reasonable diligence,' and the defendant fails to show that the delay resulted in 'specific prejudice to his defense.'").

The evidence presented at the hearing in this case shows that the FBI engaged in efforts to locate Davis from at least August 2013, through his arrest in March 2016. Specifically, from August 2013 until his transfer to another field office in December 2014, Agent Fears interviewed Tibbs and Simmons; spoke with Bridgett and Breshun Betts, both of whom Davis was believed to have resided with at the time of the charged robberies; interviewed D.S., who was implicated by his brother as having been involved in the robberies but was not charged; spoke with the manager of Davis' most recent employer and obtained his employment application and time cards; spoke to Davis' grandparents and cousin at the Waterboy Road residence; contacted Davis' cousin on one to two more occasions; surveilled the Waterboy Road residence on several occasions; spoke with Davis' ex-girlfriend, Simpkins, about Davis' whereabouts; surveilled additional apartment complexes, as well as the Waterboy Road residence and Simpkins' address, and spoke with apartment managers and maintenance workers at each of the apartment complexes; and spoke to Davis, who contacted Agent Fears directly and said that he would turn himself

in to authorities after Christmas following Agent Fears' advisement that a state warrant had been issued for his arrest, but Davis failed to do so, and the superseding indictment was returned against him the next month. (Tr. at 15-27, 29-31, 33-44, 47, 55-56, 59, 62, 148; Def. Ex. 1; Gov. Exs. 5, 6, & 7).

Following Agent Fears' transfer to another field office, Agent Jonsson continued the investigation, and from December 2014, through his reassignment to a different squad in mid-October 2015, he ran a public records search through the CLEAR database, which led to the discovery that Kiante Davis, Davis' brother, was incarcerated in the Fulton County jail under Davis' identifying information; interviewed Kiante Davis in jail concerning his brother's whereabouts; obtained jail recordings, which led to his seeking cell site data for a phone believed to belong to Davis' mother and toll records for a phone being used by Kiante Davis to make three-way calls from jail; discovered that Kiante Davis' arrest under Davis' name may have led to the federal warrant being pulled from the NCIC database in October 2014 and he therefore had it reinstated in December 2014, but had to have it corrected in February 2015; surveilled the Waterboy Road residence on about five occasions; contacted Davis' grandfather and met with him at the Waterboy Road address; spoke with some of the Waterboy Road area neighbors; obtained Department of Labor records showing Davis' most recent wage information was for

23

the period from the second quarter of 2014; contacted a colleague in the Chicago area to check if anything came back for Davis in that area; interviewed Burkes, Davis' cousin, at the Fulton County jail; spoke with Burkes' girlfriend, Preston, about Davis' whereabouts; surveilled both addresses associated with Burkes and Preston; contacted Simpkins on two occasions and surveilled her address; elicited the assistance of an FBI analyst; checked databases for Davis' mother's work history and spoke to her employer at a caregiving facility; and surveilled another residence that showed up as being used again on a more recent public records search and spoke with a neighbor concerning Davis' whereabouts. (Tr. at 67-81, 83-95, 104-09, 111-12, 148-49).

After Agent Jonsson's reassignment, Agent Winn continued the investigation, and from November 2015 through Davis' arrest in March 2016, he ran a criminal history check and a CLEAR database check on Davis; reviewed the cell site data Agent Jonsson had obtained; enlisted the assistance of an analyst to conduct other checks, including social media checks, which resulted in a photo of Davis from 2012 being pulled from Simpkins' Facebook account; confirmed that the most recent wage information for Davis was from the second quarter of 2014; conducted a financial check of Davis; surveilled the Waterboy Road address; spoke with the manager of two other possible locations for Davis; ran an off-line NCIC database search, which

led to the discovery that Michigan authorities had queried Davis' name and that he was referenced in a report regarding an alleged domestic assault incident that occurred there in November 2014; compared information obtained on Davis' mother and brother, which led to the discovery of a Mt. Gilead address that was associated with each of them in July and November of 2015, respectively; and surveilled the Mt. Gilead address and spoke with a maintenance man who recognized Davis and confirmed that he was living in Unit 8, which ultimately led to his arrest on the outstanding federal warrant. (Tr. at 116-23, 125-27, 129-33, 136-38, 141, 145-46, 148, 152-53; Gov. Exs. 10, 11, & 12).

Based on this evidence regarding the FBI's investigation of Davis and his whereabouts, the Court finds that the government pursued locating Davis for prosecution with reasonable diligence. Harris, 376 F.3d at 1290. The Court's finding is informed by the Eleventh Circuit decisions in Ingram, 446 F.3d at 1332, and United States v. Clark, 83 F.3d 1350 (11th Cir. 1996) (per curiam), both of which are relied upon by the parties. See [Doc. 171 at 13-16; Doc. 178 at 3; Doc. 196 at 10, 12; Doc. 200 at 13; Doc. 202 at 4-5]. The Court agrees with the government that the present case "presents much stronger factors than [Clark] and is distinguishable from [Ingram]." [Doc. 171 at 14].

In <u>Clark</u>, the defendant was indicted in September 1993 and arrested in February 1995, and neither defendant, nor his counsel, were aware of the indictment until defendant's arrest.  83 F.3d at 1352.  From the time of his indictment to his arrest, the defendant continuously lived in the same apartment listed on the arrest warrant, and officers only made one attempt to locate him before suspending their efforts "apparently under the impression that the U.S. Marshal's office would take over."  <u>Id.</u>  The defendant raised a speedy trial challenge, and the Eleventh Circuit determined that the 17-month post-indictment delay triggered consideration of the <u>Barker</u> factors, finding that the delay, though "unintentional," was "solely attributable" to the government's negligence.  <u>Id.</u> at 1352-53.  In particular, the Eleventh Circuit noted that "[d]uring the entire duration of the delay, [the defendant] continuously resided in the same apartment listed on the arrest warrant and attended classes at the same local university as he had prior to his alleged illegal activities," and that there was "no evidence that [he] attempted to elude the authorities in any way, nor that he or his counsel were even aware of the indictment until his arrest."  <u>Id.</u> at 1352.  Based on these findings, the Eleventh Circuit agreed with the district court and found that the government's "failure to arrest [the defendant] was due entirely to negligence" and that it "failed to act with appropriate diligence in pursuing [the defendant]."  <u>Id.</u> at 1352-53.  Although the Eleventh

Circuit found that the 17-month delay was solely attributable to the government's negligence, it concluded that this was "insufficient to excuse defendant[] from showing actual prejudice," and it reversed the district court's decision to dismiss the indictment, finding the "delay between the federal indictment and [defendant's] arrest did not violate his Sixth Amendment right to a speedy trial."  Id. at 1354 (citation omitted).  Here, the government's "efforts to locate [Davis] are notably distinguishable from the lack of effort made in [Clark]," Lamar, 562 F. App'x at 805 n.3, yet in Clark, the Eleventh Circuit found that the second Barker factor still did not weigh heavily in defendant's favor, despite the delay being solely attributable to the government's negligence, Clark, 83 F.3d at 1352-54.

In Ingram, by contrast, the Eleventh Circuit determined that the government's negligence in delaying the defendant's arrest following his indictment weighed heavily against the government.  446 F.3d at 1339.  In that case, the investigating agent referred the defendant's case to the U.S. Attorney's office, but did not hear anything for more than two years, and when he checked, he was told that the case had been "misplaced."  Id. at 1335 (internal marks omitted).  After the defendant was indicted two and a half years following the alleged criminal conduct, the agent left voicemail messages for the defendant to call him, and on two occasions, the defendant did so, but sometime after he provided the agent with his contact

numbers, he changed his cell phone number and disconnected his home phone.  Id.
at 1335, 1337-38.  However, throughout the post-indictment period, the agent "knew
where [the defendant] lived and worked and that [he] had a brother who was a Fort
Lauderdale policeman," but he "never visited [his] place of employment (where he
had originally interviewed [him]); and he visited [his] residence only once when, not
finding [him] there, he relied on an unidentified (and undescribed) person outside
the residence who told him that [he] did not live there anymore."  Id. at 1339-40.
The agent also "did not contact [the defendant's] brother to ask [about the
defendant's] whereabouts."  Id. at 1340.  And, there was "no evidence that [the
defendant] knew of the indictment," and when he was finally told about it, he
"agreed to surrender in court[.]"  Id. at 1335.

    The Eleventh Circuit found that the government was negligent, id. at 1339,
and concluded that the district court erred in attributing any part of the delay to the
defendant since it failed to make any finding as to whether the defendant had
intentionally evaded prosecution, id. at 1337.  The Eleventh Circuit then found that
even if the district court had made such a finding, it would have been erroneous
under the facts of the case since there was "no evidence [the defendant] knew of the
indictment or the arrest warrant at any time during the two years preceding his
voluntary surrender," or "even suspected [that the agent] planned on arresting him"

since his "offense was a nonviolent crime[.]" Id. (citations omitted).  Comparing the

case to Clark, the Eleventh Circuit noted that the delay was "more weighty," and

given the "inordinate pre-indictment delay," that the government's "negligence in

creating the delay [was] more egregious in [Ingram]," finding the record did not

"support any reasonable explanation for the [g]overnment's neglect in executing the

warrant."  Id. at 1339 (emphasis omitted).  The Eleventh Circuit concluded that the

investigation was simply not performed diligently.  Id.  Concluding that all three

Barker factors weighed heavily against the government, the Eleventh Circuit

remanded the case to the district court with instructions to dismiss the defendant's

indictment.  Id. at 1340.

"This case falls squarely in between Ingram and Clark."  United States v.

Uranga, Criminal Case No. 1:13-cr-00463-LMM-LTW, at [Doc. 95 at 17] (N.D. Ga.

Sept. 9, 2016).  Unlike Ingram, the three FBI agents successively assigned to this case

took multiple and various steps in their investigations of Davis' whereabouts,[25] and

_____

[25] And, unlike Ingram, there was no inordinate pre-indictment delay.  Indeed,
"the investigation [here] was much more complex than the investigation in Ingram,"
the "crimes at issue [] were believed to be committed by a conspiracy and involved
multiple [robberies]," the "law enforcement officers [] were not able to make their
entire case from review of paperwork and a couple of witness interviews," and
"[u]nlike the single-defendant [engaged in a street crime] in Ingram" where the
investigation "appeared to be completed more than two years and three months
before the indictment was obtained," "the investigation here identified [five]
suspects" and "appeared to continue almost until the time the [superseding]
[i]ndictment was obtained."  Uranga, Criminal Action No. 1:13-cr-00463-LMM-LTW,

Davis is not completely without responsibility for at least some measure of the delay because the evidence shows that he was aware that there was a state warrant for his arrest in connection with the robberies at issue, and he had agreed to turn himself in to local authorities in December 2013, though he never did.  Moreover, although there is evidence that he knew the FBI wanted to speak with him and had left word with a number of his relatives and friends that the FBI was looking for him, he never contacted the FBI again after the phone call he made to Agent Fears in December 2014, during which he agreed to turn himself in on the state charges after the Christmas holidays.  See (Tr. at 24-26, 29-30, 40, 43-44, 47, 70-71, 74, 77-80, 83, 87, 91-93, 104, 121-27; Def. Ex. 1; Gov. Ex. 10).  In fact, Davis was finally arrested while in the company of his cousin, Burkes, who had been interviewed by Agent Jonsson in February 2015 while incarcerated at the Fulton County jail, and when Agent Jonsson advised Burkes that he was looking for Davis, Burkes said that if Agent Jonsson could get him released from jail, "he would help [him] find [Davis.]"  (Tr. at 83).  Also unlike Ingram, the FBI agents did not know where Davis lived, and the record does not indicate that Davis had one stable residence throughout the period of time the FBI was searching for him.  In fact, his former girlfriend, Simpkins, told the FBI that Davis' "living arrangements were pretty unstable," and that he was "from place

---

at [Doc. 95 at 18-20 (citations omitted)].

to place," (Tr. at 29-30), and no family member provided the FBI an accurate address or current contact number for him.

Davis argues that the government's "initial efforts [to locate him] appear to be largely superficial and, somewhat, negligent."  [Doc. 196 at 11].  In particular, Davis asserts that "[f]or nearly two years, the instant case was assigned to Agent Fears who failed to follow up on leads"; that when Agent Fears was transferred, he failed to leave "notes or reports for a subsequent agent to follow"; that Agent Fears "did not issue a proper warrant for [] Davis with his correct information"; that "proof of Agent Fears's lackadaisical attitude is that [] Davis's brother . . . sat in jail for three months before any agents attempted to even speak to him"; that while some mistakes were corrected under Agent Jonsson, others were made, including reissuing a warrant for Davis with an incorrect FBI number attached to it and attempting to obtain a pen register for Sheila Davis' phone under an incorrect number that had to be corrected later; and that his "actions [did] not show any evidence of intent to evade arrest."  [Doc. 196 at 13; Doc. 202 at 2-3].

Davis' arguments regarding Agent Fears' initial efforts to locate him prior to the return of the superseding indictment are unpersuasive.  Agent Fears had to devote time at the beginning of his investigation to identifying Davis as a suspect in the robberies.  When Agent Fears entered the investigation around May of 2013,

he was aware that more than two individuals were involved in these robberies, but Davis had not yet been identified as a suspect, so Agent Fears was tasked with the responsibility of identifying the other suspects involved in the robberies.  (Tr. at 9-10).  It was not until August 26, 2013, that Tibbs "implicated [] Davis in the series of McDonald's robberies occurring in the metro Atlanta area."[26]  (Tr. at 15).   On September 24, 2013, Simmons "also implicated [] Davis in the series of McDonald's robberies."  (Tr. at 17).   However, there was some conflicting information on the relative roles of the participants in the robberies, (Tr. at 20), and as Agent Fears attempted to sort this out, he actively searched for Davis through the many steps previously discussed prior to the return of the superseding indictment in January 2014.  (Tr. at 15-27).  Thus, unlike in Ingram, this case did not lie dormant for a long period of time, and there was no significant pre-indictment delay as only a few months passed between the time that Davis was implicated in the robberies and he was indicted.  Moreover, Agent Fears' efforts to locate Davis proved somewhat successful, as Davis called Agent Fears in December 2013, and as previously discussed, Davis agreed to surrender on the state warrant for his arrest after Christmas, but he failed to do so, and thereafter proved difficult for the FBI to locate.

_____

[26] When Tibbs initially spoke with the Dunwoody police officers, he only "mentioned [] Davis' name to them just as a friend, but he didn't mention or implicate him in any of the robberies at that time."  (Tr. at 16).

Undoubtedly, the steps taken during the course of the investigation could have been performed differently, and perhaps even better, as Davis suggests; however, when a defendant is missing, "the government is not required to exhaust all conceivable avenues in finding him." Spaulding, 322 F. App'x at 946 (citation and internal marks omitted).  Indeed, "[t]he Sixth Amendment mandates only a diligent, good-faith effort on behalf of the government to find the defendant and bring him to trial." Id. (citation and internal marks omitted).  Thus, "if the government pursues a missing defendant with reasonable diligence from his indictment to his arrest, then no speedy trial violation exists," and "[t]his conclusion generally holds no matter how great the delay, so long as the defendant cannot show specific prejudice to his defense." Id. (citation omitted).

While "[i]t is true the government may have been able to do more [here,] [] its failure to do so was not egregious given its continuous, good-faith efforts to locate [Davis]," and "although the post-indictment delay here was longer than the two-year delay in Ingram, the government's concerted efforts to locate [Davis] greatly exceeded the less than weak attempts of the single law enforcement agent pursuing Ingram," id. at 946-47 (footnote, citation, and internal marks omitted), and "[t]here is absolutely no evidence of bad faith by the government," United States v. Davenport, 935 F.2d 1223, 1240 (11th Cir. 1991).  Therefore, the Court concludes that

the "government took reasonable and diligent steps to locate [Davis], including running comprehensive database checks and speaking with his [relatives]," Lamar, 562 F. App'x at 805, and that Davis, at the very least, knew there was a state warrant for his arrest on the robberies at issue in this case and that the FBI wanted to talk to him, and although he had said that he would turn himself in on the state warrant, he did not do so and never again contacted the FBI, although agents continued to contact family members and friends in their ongoing efforts to locate him.  Id. Indeed, when he was arrested, Davis was with a family member who knew the FBI was looking for him and had offered to help locate Davis if the FBI got him out of jail.  (Tr. at 83).  Thus, even though this factor does weigh against the government, "it [does] not weigh heavily against the government."  Lamar, 562 F. App'x at 805 (citation omitted); see also United States v. James, 183 F. App'x 923, 927-28 (11th Cir. 2006) (per curiam) (unpublished); Duke, 2011 WL 1811439, at *3.[27]

---

[27] Because the Court finds that the second Barker factor does not weigh heavily against the government, even if it is assumed that the first and third factors weigh heavily against the government, Davis is not relieved of his burden of proving actual prejudice since all of the first three Barker factors do not weigh heavily against the government.  See Jones, 2007 WL 2071267, at *23 (citation omitted); see also Davenport, 935 F.2d at 1239 (assuming without deciding that factors one and three weigh heavily against the government and noting that defendant "must either establish that the reasons for the delay weigh heavily in his favor, in which case he may not be required to show prejudice, or demonstrate prejudice to satisfy the fourth element of the *Barker* analysis").

Because "the second *Barker* factor does not weigh heavily against the [g]overnment, [Davis] must show actual prejudice." United States v. Cadet, 521 F. Supp. 2d 1351, 1355 (S.D. Fla. 2007) (citation omitted); see also Spaulding, 322 F. App'x at 947 (citations omitted); United States v. Burke, 673 F. Supp. 1574, 1580 (N.D. Ga. 1986), aff'd, 856 F.2d 1492 (11th Cir. 1988) (per curiam) ("[I]n order for the defendants to prevail on their Sixth Amendment claim, they must establish actual prejudice resulting from the delay," since only the length of the delay weighed heavily in the defendants' favor.).  In order to show actual prejudice, Davis "must demonstrate one of the following: (1) oppressive pretrial incarceration, (2) anxiety and concern, or (3) possible impairment of his defense." Spaulding, 322 F. App'x at 947 (citation omitted).  And, Davis "must proffer more than conclusory assertions of prejudice or unsubstantiated allegations[.]" Id. (citation and internal marks omitted).

Davis does not argue that he has suffered actual prejudice in this case.  See generally [Docs. 178, 196, & 202].  Rather, he maintains that because the "two-year delay was the cause of the [g]overnment's lack of diligence in finding [him], [he] does not need to show actual prejudice in order to prevail." [Doc. 202 at 6 (citation omitted)].  However, "[w]hile it is true that affirmative proof of particularized prejudice is not essential to every speedy trial claim, where the other factors do not

indicate a constitutional violation, a defendant must show he suffered actual prejudice from the delay." United States v. Twitty, 107 F.3d 1482, 1490 (11th Cir. 1997) (citations and internal marks omitted). Simply put, "the record does not indicate that [Davis] suffered actual prejudice due to the delay." Harris, 376 F.3d at 1291 (footnote omitted). Indeed, Davis was not incarcerated during the delay, and he "has offered nothing to suggest either that his defense was impaired during the delay or that he suffered some especial anxiety as a result of the delay." Id. at 1291 n.7; see also United States v. Smith, 318 F. App'x 780, 791 (11th Cir. 2009) (per curiam) (unpublished) (finding no Sixth Amendment right to a speedy trial violation and noting that defendant's brief stated "only the conclusion that he suffered prejudice, without enumerating how or why"). Davis' "failure to do so does not support his claim." Twitty, 107 F.3d at 1490. Accordingly, it is **RECOMMENDED** that Davis' motion to dismiss the superseding indictment, [Doc. 163], be **DENIED**.

### III. CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Davis' pending motion to dismiss the superseding indictment, [Doc. 163], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 1st day of November, 2016.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE